*In re* WILLIAM LUTTRELL, Asserted to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. William Luttrell, Respondent-Appellant).

Fourth District   No. 4—93—0867

Argued March 22, 1994.—Opinion filed April 13, 1994.

Melissa McGrath (argued), of Guardianship & Advocacy Commission, of Peoria, and Jeff Plesko, of Guardianship & Advocacy Commission, of Anna, for appellant.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, Elliott Turpin, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

William Luttrell appeals from an order finding him to be a person subject to continued involuntary hospitalization. (Ill. Rev. Stat. 1991, ch. 91½, par. 3—813.) Luttrell raises three procedural and two substantive arguments in support of the reversal of the order. We find several of the arguments persuasive and reverse.

## I. FACTS

Luttrell has been hospitalized in the Adolf Meyer Mental Health and Developmental Center (Center) intermittently since 1985. His most recent period of hospitalization apparently began on March 18, 1993. The record does not reflect when the order providing for this hospitalization was entered. On September 20, 1993, 186 days after Luttrell's hospitalization began, Luttrell was examined by two psychiatrists at the Center. Pat Mitchell, a registered nurse at the Center, completed a petition for involuntary hospitalization. The petition was filed the same day. It alleged Luttrell was unable to provide for his basic physical needs so as to guard himself from serious harm. The petition did not indicate the names and addresses of Luttrell's family members, nor was a current treatment plan filed with the

court. The court set the matter for hearing on the following morning and appointed a public defender to represent Luttrell.

At the September 21, 1993, hearing on the petition, Mitchell testified she had known Luttrell since 1985. On September 16, 1993, Luttrell threw objects about in his room and in the rooms of other patients. On September 18, 1993, Luttrell left the Center, without permission, by breaking a window and exiting through it. Mitchell was not present at the time of Luttrell's "escape"; however, at a later time she heard him comment that he would "raise some hell if he didn't get out." Mitchell opined Luttrell has very little insight into his problems.

Dr. Gilbert Bogen testified he is a psychiatrist and, as of the date of the hearing, had been employed at the Center for two weeks. Based on his review of Luttrell's records, Bogen testified Luttrell "carries a schizoaffective disorder," meaning he has demonstrated symptoms of both a psychotic nature and a mood disorder. Bogen opined Luttrell is mentally ill and is not currently stable on his medication. He additionally opined Luttrell may reasonably be expected to inflict harm upon himself or others and is unable to guard himself from serious physical harm. Bogen arrived at the latter opinion after speaking with Luttrell's father. Bogen represented Luttrell's father did not believe Luttrell would ever be able to live alone.

On cross-examination Bogen testified, to his knowledge, Luttrell had been taking his medication; however, laboratory tests revealed the medication in Luttrell's system was not within the "therapeutic range." Bogen was unable to offer an opinion on the length of the period of hospitalization which would be required after Luttrell's medication is adjusted to fall within the therapeutic range.

Luttrell testified on his own behalf. Luttrell apologized for breaking the window and offered to pay for the damage. He explained he had been denied cigarette smoking privileges and left the Center because he needed cigarettes. He testified he had lived independently in the past and, if released, would live with his brother. Luttrell represented his brother had agreed to such an arrangement. On cross-examination, Luttrell testified his brother was not present at the hearing.

The State called Dr. Alfred Jocson as a rebuttal witness. Jocson testified he had known Luttrell since 1985. Jocson testified Luttrell had been placed on "smoking restriction" because he had been apprehended smoking in his room, in contravention of the Center's rules. According to Jocson, Luttrell told him he (Luttrell) left the Center on September 18, 1993, to acquire and smoke some cigarettes. Jocson testified there had been a possibility of releasing Luttrell and

placing him with his father. Jocson arranged a meeting with Luttrell's father to explore this option; however, Luttrell's father failed to attend the meeting. Since Luttrell's father did not appear to be willing to take Luttrell into his home and since Luttrell's current condition is such that he cannot live alone, Jocson requested Luttrell be remanded to the Center.

At the close of the evidence the trial court made no specific findings of fact, but found the State proved the petition by clear and convincing evidence. The court ordered Luttrell's continued commitment to the Department of Mental Health for a period not to exceed 180 days.

Luttrell appeals, alleging, (1) a current treatment plan was not presented or detailed to the court, (2) the State failed to prove by clear and convincing evidence that hospitalization was the least restrictive treatment alternative, (3) the petition for involuntary admission was untimely, (4) the petition was fatally defective as it did not specify the names and addresses of Luttrell's family members, and (5) the State failed to prove by clear and convincing evidence that Luttrell was subject to involuntary commitment.

## II. TREATMENT PLAN

Luttrell alleges his continued involuntary commitment must be reversed due to the State's failure to file a current treatment plan. Where the State seeks to continue any involuntary commitment, the facility director *shall* file with the court a current treatment plan which includes an evaluation of the patient's progress and the extent to which he is benefiting from the treatment. (Ill. Rev. Stat. 1991, ch. 91 1/2, par. 3—813(a).) The purpose of this section is to prevent the warehousing of individuals with mental illnesses. It is a mechanism to ensure individuals who are repeatedly involuntarily hospitalized receive appropriate care and treatment. It also assists the court in its continuing supervision of the care and treatment of involuntary patients to ensure their progress is monitored and evaluated. *In re Robinson* (1992), 151 Ill. 2d 126, 136-37, 601 N.E.2d 712, 718.

The State concedes it did not file a current treatment plan with the court; thus, it is uncontroverted that the State did not strictly comply with the requirements of section 3—813(a) of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1991, ch. 91 1/2, par. 3—813(a)). The State, however, contends it substantially complied with section 3—813(a), rendering the failure to file a written treatment plan harmless error. The State did not substantially comply with the statute.

Although section 3—813(a) of the Code contemplates the filing of

a *written* treatment plan, where the respondent does not object at the hearing to the State's failure to file a written treatment plan, the State's failure to do so may be regarded as harmless error where it substantially complies with the statute by offering oral testimony regarding the treatment plan. (*Robinson*, 151 Ill. 2d at 136-37, 601 N.E.2d at 718.) In *Robinson*, the court rejected respondent's contention that the State did not substantially comply with the statute. The court found substantial compliance with the statute because testimony on the following matters was presented: (1) the diagnosis of respondent's affliction, (2) a treatment plan had been developed, (3) the contents of the treatment plan, (4) description and evaluation of respondent's progress, and (5) an explanation of why it would be difficult to project the time of respondent's release from the mental health facility.

■ The oral testimony presented with respect to Luttrell's treatment falls woefully short of that presented in *Robinson*. Although testimony regarding the first factor, Luttrell's diagnosis, was presented, little or no testimony was presented with respect to the other matters which persuaded the *Robinson* court to find the State cured its failure to comply with the statutory requirement to file a written treatment plan.

Turning to the second and fifth factors, the existence of a treatment plan and length of hospitalization, the State presented no testimony that a written treatment plan had been developed for Luttrell. The testimony regarding the anticipated length of Luttrell's hospitalization was, at best, vague and uncertain. Bogen testified Luttrell would not be eligible for release until his medication had been adjusted, but offered no explanation as to the length of the adjustment process. In contrast, Jocson's testimony suggests Luttrell could have been released and placed with a relative even though his medication had not been adjusted; however, the medication would need to be adjusted before Luttrell could be released to live independently.

Most significant, however, was the absence of testimony with respect to the third and fourth matters: the treatment Luttrell was receiving and the description and evaluation of his progress. The only testimony regarding the treatment Luttrell was receiving was that, at the time of the hearing, he was "due for a prolixin decanoid shot," and, at some unspecified time prior to the hearing had a lithium level of .4, which, apparently, is not "within the therapeutic range." No evidence was presented regarding whether Luttrell's lithium level had not been "within the therapeutic range" during his entire period of hospitalization or whether it was only at the one unspecified time that this deficiency occurred. Moreover, there was no

explanation of why, during a six-month period of hospitalization, the doctors had been unable to adjust Luttrell's medication to a level "within the therapeutic range." Bogen testified to his knowledge Luttrell was taking his medication as prescribed, but "[i]t is possible he is flushing out a lot of lithium by ingesting caffeinated products which will do that." No evidence was presented on whether Luttrell actually consumed caffeinated products or whether measures had been taken to restrict his caffeine intake. The only description and evaluation of Luttrell's progress was that his behavior had escalated in the week prior to the hearing. The State presented no evidence regarding Luttrell's progress during the first six months of his hospitalization.

The absence of testimony regarding Luttrell's treatment and progress is most significant because it is impossible for the court to fulfill its obligation to supervise the treatment of an involuntarily committed patient and assure his progress is monitored and evaluated where little or no testimony is presented regarding that person's treatment and progress.

Thus, since the State failed to file a written treatment plan and the oral testimony presented by the State was inadequate to satisfy the purposes of the treatment plan, Luttrell's involuntary commitment must be reversed.

### III. LEAST RESTRICTIVE ALTERNATIVE

■ Reversal of the order of continued hospitalization is also warranted because the State did not meet its burden to prove commitment to a mental health facility was the *least* restrictive treatment alternative. If a person is found to be subject to involuntary admission, the court has several options at its disposal: ordering hospitalization, ordering outpatient treatment, or ordering the person to be placed in the care of a relative or other person willing to care properly for him. (See Ill. Rev. Stat. 1991, ch. 91$^1$/$_2$, par. 3—811.) There is a statutory preference for treatment other than hospitalization. (*In re Long* (1992), 237 Ill. App. 3d 105, 112, 606 N.E.2d 1259, 1264.) The court must order placement in the least restrictive placement alternative. (*Long*, 237 Ill. App. 3d at 111, 606 N.E.2d at 1264; Ill. Rev. Stat. 1991, ch. 91$^1$/$_2$, par. 3—811.) Thus, hospitalization may only be ordered if the State proves it is the least restrictive treatment alternative. In the present case, the evidence does not support a finding the State proved involuntary commitment is the least restrictive alternative. The evidence established placement with a relative was a viable option, and Luttrell's uncontroverted testimony was that his brother had agreed to allow Luttrell to reside with him.

The State alleges it met its burden of proving hospitalization was the least restrictive treatment alternative because Bogen, the psychiatrist who treated Luttrell for two weeks, opined that it was. This opinion, standing alone, is insufficient to satisfy the State's burden of proof. The requirement the State prove hospitalization is the least restrictive treatment alternative is not met merely because the State's expert opines commitment is the least restrictive means. (*Long*, 237 Ill. App. 3d at 112, 606 N.E.2d at 1264.) The opinion of the expert must be supported by the evidence. Contrary to the State's contentions on appeal, Bogen's opinion was not supported by the evidence and was impeached by the testimony of Jocson, the State's other expert witness, who indicated Luttrell could be placed with a relative.

Jocson, the psychiatrist who had been involved in Luttrell's treatment for eight years, testified there had been a possibility of discharging Luttrell and placing him in his father's home. Jocson set up a meeting with Luttrell's father to determine whether he would be amenable to such an arrangement; however, Luttrell's father failed to attend the meeting. Thus, Jocson concluded Luttrell's father was not willing to allow Luttrell to reside with him. Since Luttrell's father was not willing to care for Luttrell, and because Luttrell's condition is such that he cannot live independently of both the hospital and his family, Jocson determined Luttrell should remain in the Center.

Since the evidence established relative placement would be an appropriate alternative for Luttrell, it was error to order Luttrell's commitment to the Center where the uncontroverted evidence established the less restrictive environment of Luttrell's brother's home was an available alternative. In *People v. Sharkey* (1978), 60 Ill. App. 3d 257, 265, 376 N.E.2d 464, 469, the appellate court rejected the respondent's contention, in an initial commitment proceeding, that the State did not prove hospitalization was the least restrictive means because it did not prove he could not return to his father's home, where respondent had lived until the time of his emergency hospitalization. The court noted placement in the less restrictive environment of the father's home would not have been appropriate since the father signed the petition to have respondent involuntarily committed. The present case is distinguishable. In *Sharkey*, respondent's father was, apparently, unwilling to have respondent reside with him and no evidence was presented regarding other potential relative placements. Conversely, in the present case, although Luttrell's father may not have been willing to invite Luttrell into his home, Luttrell testified his brother had agreed Luttrell could live

with him. We do not expect the trial court to automatically believe respondent's assertion. However, the State presented no evidence contradicting this testimony. Nor did the State present evidence that Luttrell's brother would be unable to care for Luttrell. In fact, there is no evidence in the record indicating the State made *any* attempt to contact Luttrell's brother to explore the possibility of placing Luttrell in his residence. Nor does the record reflect Luttrell's brother was notified of the readmission proceedings.

In conclusion, since the State's own witness testified Luttrell could have been placed with a relative had a relative been amenable to such an arrangement, and the uncontroverted testimony established Luttrell's brother was willing to allow Luttrell to live with him, we must conclude the State failed to prove commitment to a mental health facility is the least restrictive alternative.

## IV. UNTIMELY FILING OF THE PETITION

Luttrell next alleges the petition for continued hospitalization was untimely filed. The State defends against this allegation, contending it is not clear whether the petition was untimely filed, and, alternatively, this error was waived due to Luttrell's failure to raise it in the trial court.

We find it troubling that whether the petition for continued admission was timely filed cannot be ascertained from the record. A petition for continued admission must be filed prior to the expiration of the prior order of commitment. (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 3—813.) An order of commitment may be entered for any period of time, not to exceed 180 days. (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 3—813.) The record in the present case does not specify the date of any prior order of commitment, nor does it specify the length of the period of hospitalization which might have been ordered.

According to the State's social investigation report, dated September 20, 1993, Luttrell has been "hospitalized continuously" since March 18, 1993, 186 days prior to the filing of the petition for continued hospitalization.

■ The State contends it is *possible* Luttrell was hospitalized for several days prior to the entry of the order finding him to be subject to involuntary admission. Specifically, the State alleges it is *possible* that Luttrell was hospitalized on an emergency basis on March 18, 1993. Since the petition for involuntary admission need only be filed within 24 hours of respondent's emergency hospitalization (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 3—611), it is *possible* the petition was not filed until March 19, 1993. Since the hearing on the petition may occur at any time within five business days (Ill. Rev. Stat. 1991, ch.

91¹/₂, par. 3—611), it is *possible* the hearing was not held until March 26, 1993, the fifth business day, at which time it is *possible* the court entered an order finding Luttrell to be a person subject to involun-tary commitment. Since a person found to be subject to involuntary commitment may be committed to a mental health facility for a period not to exceed 180 days (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 3—813), it is *possible* Luttrell was ordered to be committed for the maximum period of time. Thus, if this court were to make all of the assumptions set forth by the State, we could conclude the petition for continued hospitalization was timely filed. Given the important liberty interests of the respondent, we do not believe we ought to make a string of unsupported speculations in order to reach the ultimate assumption the proper procedures were followed. The deadlines set forth in the Code are not mere technicalities. They are bright lines created by the legislature to avoid deciding these cases on an *ad hoc* basis and to prevent abuse of the procedures involved. (*In re Lanter* (1991), 216 Ill. App. 3d 972, 974, 576 N.E.2d 1219, 1220.) That the statutory procedures *may* have been followed offers little certainty that respondent's liberty interests have, *in fact*, been safeguarded.

The State next contends that even if the petition was untimely filed, Luttrell waived consideration of the issue due to his failure to object at the hearing. Waiver of appellate consideration may be found where the respondent did not object at the hearing *and* he suffered no prejudice as the result of the State's failure to comply with the statutory procedures. (See *In re Nau* (1992), 153 Ill. 2d 406, 419-21, 607 N.E.2d 134, 140-41.) Thus, in *Nau*, the court found the respondent waived consideration of the State's untimely filing of the petition for continued hospitalization. Respondent had not objected at the hearing, and suffered no prejudice because, "had respondent made a timely objection, the State would simply have withdrawn its petition for continued hospitalization and filed instead a petition for initial commitment." *Nau*, 153 Ill. 2d at 421, 607 N.E.2d at 141.

Incidentally, we disagree with any suggestion the supreme court in *Nau* impliedly approved circumventing statutory procedures for continued hospitalization. Where continued hospitalization is desired, the legislature has *not* provided the State with the alternatives of *either* filing a petition for continued hospitalization within the statutory time frame or disregarding the statutory time frame and filing a petition for initial commitment. Rather, the legislature has provided that where continued hospitalization is desired the State may file a petition for such *prior to the expiration of the original order of commitment*; if no petition is filed, the respondent *shall* be discharged. (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 3—813(a).) Accordingly,

we question the propriety of permitting the State to disregard the procedures for continued hospitalization, detain the respondent in the mental health facility beyond the expiration of the original order of commitment despite the clear language of the statute, and then follow those procedures for initial hospitalization, where it is not initial but continued hospitalization that is sought.

The State alleges the *Nau* reasoning, applied to the present case, requires a finding of waiver. Specifically, the State alleges, Luttrell suffered no prejudice because had he objected at the hearing, the State would have merely withdrawn the petition for continued hospitalization and filed instead a petition for initial commitment.

Luttrell alleges *Nau* is distinguishable because he, unlike Nau, was prejudiced. Waiver will not be found where the respondent was or may have been prejudiced. (See *In re Stone* (1993), 249 Ill. App. 3d 861, 866, 619 N.E.2d 1345, 1348; *In re La Touche* (1993), 247 Ill. App. 3d 615, 619-20, 617 N.E.2d 844, 848; *In re Adams* (1993), 239 Ill. App. 3d 880, 884-85, 607 N.E.2d 681, 684.) Luttrell alleges he was prejudiced because, assuming the original order was entered on March 18, 1993, the behavior upon which the petition for continued hospitalization was based occurred *after* he should have been released pursuant to the original order of commitment. This argument presupposes the existence of an exclusionary rule under which a respondent's behavior during a period of unauthorized detention in a mental health facility cannot be used as the basis for a petition for involuntary admission. Since we reverse on other grounds, we need not resolve this interesting issue.

## V. REMAINING ALLEGATIONS OF ERROR

■ Similarly, since we reverse on other grounds we need not determine whether the State's acknowledged failure to list the names and addresses on the petition as required by section 3—601(b)(2) of the Code (Ill. Rev. Stat. 1991, ch. 91½, par. 3—601(b)(2)) would, in itself, constitute reversible error in this case. Nor need we address Luttrell's contention that the State failed to prove he is unable to provide for his basic physical needs.

## VI. CONCLUSION

We feel compelled to express our increasing dismay at the slipshod manner with which these cases are handled. The procedural safeguards enacted by the legislature are not mere technicalities. Rather, they are intended to safeguard the important liberty interests of the respondent which are involved in mental health cases. (See *Lanter*, 216 Ill. App. 3d at 974, 576 N.E.2d at 1220.) In furtherance of

this goal, the legislature has clearly set forth a specific time frame during which certain events in the commitment process must occur, and certain information must be presented to the court.

Despite the significance and clarity of these procedural safeguards, the cases which have come before the courts of review indicate they are routinely disregarded by the State. See *Nau*, 153 Ill. 2d 406, 607 N.E.2d 134 (petition for continued hospitalization not filed within the time frame set forth in section 3—813 of the Code (Ill. Rev. Stat. 1989, ch. 91¹/₂, par. 3—813)); *Robinson*, 151 Ill. 2d 126, 601 N.E.2d 712 (failure to file a report as required by section 3—810 of the Code (Ill. Rev. Stat. 1989, ch. 91¹/₂, par. 3—810); failure to file a treatment plan as required by section 3—813(a) of the Code); *In re Splett* (1991), 143 Ill. 2d 225, 572 N.E.2d 883 (failure to serve respondent with notice of the commitment proceedings as required by section 3—706 of the Code (Ill. Rev. Stat. 1987, ch. 91¹/₂, par. 3—706)); *Stone*, 249 Ill. App. 3d 861, 619 N.E.2d 1345 (failure to file petition within time specified in section 3—611 of the Code (405 ILCS 5/3—611 (West 1992))); *La Touche*, 247 Ill. App. 3d 615, 617 N.E.2d 844 (failure to file petition within time specified in section 3—611 of the Code); *Adams*, 239 Ill. App. 3d 880, 607 N.E.2d 681 (failure to list respondent's relatives in the petition as required by section 3—601(b)(2) of the Code (Ill. Rev. Stat. 1991, ch. 91¹/₂, par. 3—601(b)(2))); *In re Wiessing* (1992), 229 Ill. App. 3d 737, 593 N.E.2d 1137 (failure to list respondent's relatives or state a diligent inquiry had been made as required by section 3—601(b)(2) of the Code); *In re Venegas* (1991), 218 Ill. App. 3d 423, 578 N.E.2d 43 (failure to file a report as required by section 3—810 of the Code); *In re Blume* (1990), 197 Ill. App. 3d 552, 554 N.E.2d 1100 (failure to file a report as required by section 3—810 of the Code); *In re James* (1990), 199 Ill. App. 3d 316, 556 N.E.2d 839 (failure to file a report as required by section 3—810 of the Code); *In re Lamb* (1990), 202 Ill. App. 3d 725, 560 N.E.2d 422 (failure to file treatment plan as required by section 3—810 of the Code).

As we have previously noted, involuntary commitment procedures represent the balance between an individual's liberty interests and society's dual interests in protecting itself from potentially dangerous individuals while protecting and caring for those who are unable to care for themselves. The total disregard for the legislatively established procedures is contrary to the balancing of interests established by the Code and should not be condoned. *James*, 199 Ill. App. 3d at 318-19, 556 N.E.2d at 841.

For the foregoing reasons, the order of the circuit court of Macon County is reversed.

Reversed.

LUND and GREEN, JJ., concur.